## Case No. 18,313.

### UNITED STATES v. MACKENZIE et al.

[1 N. Y. Leg. Obs. 371.]

### District Court, S. D. New York.

CONSTITUTIONAL LAW — LEGISLATIVE POWER — CRIMES COMMITTED ON NAVAL VESSEL — JURISDICTION OF CIVIL COURTS AND COURTS MARTIAL.

[1. The fifth amendment to the constitution of the United States provides that "no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger." Held, that the limitation "when in actual service in time of war or public danger" refers only to the militia, and does not apply to the regular land and naval forces. In respect to these latter, the power of congress is irrespective of the actual condition of the country, and the same in time of peace as in time of war or public danger.]

[2. Congress has constitutional power to provide that crimes, even of a capital character, committed on board a naval vessel, by persons who form part of the naval forces of the United States, shall be tried exclusively by courts martial; and the act of April 23, 1800 (2 Stat. 45), establishing rules for the government and regulation of the navy, is valid, even if this be its true construction and effect.]

[3. Congress has not, by the crimes acts of 1825 and 1835 (4 Stat. 115, 775), given to the civil courts any jurisdiction over the crime of murder, when committed on board a United States ship of war, and triable before a court martial under the navy regulations.]

[4. The fact that manslaughter is not named in the naval code as an offence punishable by court martial is no ground for holding that the civil courts of the United States have jurisdiction thereof. In the absence of any statute conferring jurisdiction upon these courts, it is sufficient, in any case, to exclude such jurisdiction, that the accused is charged with the offence, in taking the life of a seaman belonging to a naval ship, in the exercise of what was claimed to be his rightful authority as an officer in command.]

[5. To warrant a court in declaring unconstitutional a law passed by congress, the defect of legislative power must be of the most plain and indisputable character.]

[6. The fact that a law of congress has been in course of execution for many years, and has been acquiesced in during that time, is a strong reason why the courts, especially those of a subordinate character, should not decide the same to be unconstitutional.]

[Alexander S. Mackenzie and Guert Gansevoort were charged before the grand jury with murder and manslaughter.]

B. F. Butler and Charles O'Connor, for the United States.

G. Griffin and John Duer, for Mackenzie and Gansevoort.

BETTS, District Judge (charging grand jury). In my charge to you on your organization, in leading your attention to subjects that might probably be brought before you, I stated, in substance, that you had cognizance of all crimes and offences in violation of the laws of the United States, and triable before the civil tribunals, whether committed within this territorial district, or within the admiralty and maritime jurisdiction of our laws. It was intended so to guard and qualify that instruction as to avoid asserting or denying a jurisdiction over crimes committed on the high seas on board a ship of war of the United States; the court wishing to leave that question, if it should be agitated before you, open for deliberate consideration and decision.

In the progress of your deliberations you came into court, and submitted in writing two inquiries, and prayed the advice and instruction of the court upon the points of law involved in them: First. Whether the grand jury has jurisdiction or is to make inquiry into offences committed on board of American ships of war on the high seas? Second. If so, is it their province to inquire into the offence alleged to have been committed by Captain Mackenzie, or any other person on board the ship of war Somers?

With these inquiries you submitted to the court three several charges in writing, which had been laid before your body, and which supply, in part, the foundation upon which the specific advice is requested: One is a complaint by Henry Morris against Alexander Slidell Mackenzie and Guert Gansevoort "for the murder of Philip Spencer, committed on the high seas, on board the United States brig Somers, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state, on the first day of December, 1842"; one by Margaret E. Cromwell, charging, in the same terms, the murder of Samuel Cromwell at the same time and place; and one by Charles Cleveland, charging the same persons with "the crime of manslaughter, in putting to death Elisha Small, at the same time and place."

No other facts are communicated by your body to the court, but the observations I shall proceed to offer, in reply to these questions, will be on the assumption that the parties named in these charges were, at the time of the alleged offences, all regularly attached to the brig of war Somers as officers and seamen, in the service of the United States, and that their several deaths were produced by the public execution of the deceased, under the orders of Mackenzie, commander of the brig, and that Gansevoort was a commissioned lieutenant in the navy, serving in that rank on board, and in that capacity aided and assisted in the executions. It will also be taken as connected with the facts of the case that on the return of the brig to the United States a court of inquiry was ordered by the secretary of the navy to investigate this transaction, and that court found and reported to the secretary that the conduct of Commander Mackenzie and Lieutenant Gansevoort in the matter was fully justified by the circumstances in which they and the ship were placed. That thereupon a court martial was ordered and convened by directions of the secretary of the navy, for the trial of Commander Mackenzie on a charge of murder, and that the court is now in session at Brooklyn, proceeding with the hearing and trial of the complaint now brought before your body.

These facts, in substance, are admitted by the prosecutors in court, and this dispenses with the necessity of referring to you the investigation and decision of the facts, in order to give application to the rules of law that will be stated to you. The right of a grand jury to apply to the court with which they are connected for advice and direction, in aid of the duties they are called upon to discharge, is fully recognized by the laws of this country and of England, and its free exercise is cherished and encouraged. For, although a jury, without a satisfactory certainty that the facts proved before them fall within any provision of the criminal law, may excusably direct an indictment, and leave it to the court afterward to decide whether the matter presented be a criminal offence, yet it is more consonant to a humane administration of justice to exempt the citizen from the pain and obloquy of a public accusation, where it is plain that no crime has been committed.

What has been said by great authorities with respect to imperfect or uncertain proof in support of a criminal charge applies with equal force when there is defective evidence that any law exists punishing the act; it being an indispensable ingredient to a criminal accusation that there be clear law both against the act charged as an offence, and to sustain the prosecution as presented. Lord Hale, Blackstone, and Chitty, in adverting to the ancient dogma that the grand jury ought to find the bill where there is probable evidence to support it, because it is only an accusation, and

the prisoner will afterwards defend himself before a more public tribunal, have all recommended a more merciful view of the subject, and, considering the ignominy, the dangers of perjury, the anxiety of delay, and the misery of a prison, insist that the grand jury should be well convinced of the guilt of the accused before subjecting him to a trial. 2 Hale, P. C. 61, 157; 4 Bl. Comm. 303; 1 Chit. Cr. Law, 318. The same reason should restrain the jury from finding an indictment, unless satisfied that the facts they present will subject the accused to a legal arraignment and punishment.

These considerations render appeals by grand juries to the court for preliminary counsel and direction proper and commendable, whenever they are not thoroughly satisfied that the case justifies their interference, in order that the citizen need not stand exposed to the reproach and terror of an infamous and perhaps capital charge, where there is a want of probable cause, either in law or evidence, to support it; as, also, that they may have the countenance and support of the court in unusual or difficult cases, or those of exciting interest, to help them to a clear understanding of their duties and an efficient execution of them. The practice to which you have been most accustomed in similar instances has undoubtedly been for the court to respond at once, or after a slight consideration, and without argument, to the inquiries propounded. But as the questions you submitted involve an inquiry into the constitutionality of an act of congress, and also into the just powers and duties of this court in the administration of criminal law in capital cases, together with the determination of the rightful authority of naval courts martial, and the effect of trials and sentences by those courts, I have thought these points to be of such weight and importance as to require, not only a mature and careful examination by me, and to justify the suspension of the other business of the court for that purpose, but also that they presented a proper occasion for me to invite counsel, as well representing those who prefer these complaints as the parties affected by them, to afford the court the benefit of an argument in aid of the decision to be rendered. The request has been acceded to, and most satisfactorily fulfilled, by the eminent gentlemen who have discussed the various and interesting topics arising out of these questions.

You have given your attendance from day to day, throughout this highly able and instructive argument, occupying more than five successive days, and you will accordingly fully comprehend that neither the time I have allowed myself to study and reflect upon the argument, nor the space within which these observations to you must necessarily be compressed, will permit me to follow out, or scarcely advert to, the multifarious positions and illustrations introduced into the discussion.

Gentlemen, it may be proper, in this connection, to add that you are not to consider the argument in court as addressed to you in your official character. In intimating to you, when your inquiries were submitted, that it would be left to your option to continue your deliberations in your room, or attend the discussion here, and in assigning you a place within the bar, the court expressed, and intended to signify, no more than its respect toward you personally. You are aware that you have not been called from day to day as embodied and in official attendance, nor is it recorded on the minutes that the grand jury has appeared in court since the day you presented these inquiries. It seemed necessary to notice these particulars, lest it might be supposed that these proceedings attempted to introduce or sanction the precedent that the grand inquest, organized and sitting as a jury, could have arguments of counsel or parties on matters under

their inquiry and deliberation addressed to them, and that it was their province to weigh and decide the points so discussed. This transaction is intended to have no such bearing, nor is it intended to consider your presence here as in any way varying or diminishing the rightful authority or responsibilities of the court. The questions proposed are strictly questions of law, which it is the province and duty of the court to decide, and I have not the slightest reason to doubt that in asking this advice you meant to recognize the authority of the court over the matter, and to abide by the replies that may be given; otherwise, this solemn investigation, and the prolonged toils attending it, would be but an idle parade.

The court cannot fail to perceive and appreciate the delicacy and importance of the points it is called upon to decide. Your inquiries are so framed as to present the subject in its most solemn form, as well as to awaken those solicitudes and sympathies naturally accompanying the application of general rules to individual cases. You ask whether your authority extends to the investigation of offences committed on board American ships of war on the high seas; and, if so, whether the matters set forth in these specific complaints are within your jurisdiction. The occurrence on board the Somers, with all its painful consequences, is thus brought directly in view, but is manifestly of subordinate importance in your estimation, as ministers of the law, to the great question propounded touching the administration of criminal justice, and which interests and affects alike the individual citizen and the government, in the whole extent and duration of their rights and responsibilities under this branch of the law. This question ought to be calmly investigated and decided as a naked proposition of law, and without allowing the judgment to be disturbed by apprehensions that the conclusion adopted may, in its operation, place the parties accused in this instance under increased liabilities and dangers, or may tend to afford them extraordinary privileges and advantages of defence.

You are undoubtedly aware, gentlemen, that the subject matter involved in this special case has been under consideration before me, on several instances previous to the sitting of this court, and that I declined awarding a warrant to arrest these parties.[1] The disposition then made of the case was under special aspects of the subject, and does not necessarily embrace the main points now submitted; and, even if it involved the same matters, I feel called upon to examine and consider the whole subject, under the aid of the argument now heard, as if it had never before been brought to my attention.

In proceeding to the investigation of the juridical facts demanded by your inquiries, it may be fitting the occasion for me to say that it cannot be of the slightest consequence to the court how those facts may be found. I shall not hesitate to assume for my learned associate who presides in this court, nor to assert for myself, that the court never hesitates or shrinks from applying the full jurisdiction conferred upon it by law over whatever subjects or persons such jurisdiction may operate; and never seeks, or permits itself to exercise, one that it does not find clearly bestowed upon it by the law. Neither can it be of any moment to the judges whether they sit in judgment over crimes committed on the high seas, on board merchant vessels or war vessels, nor whether the individuals brought to trial be commanders and officers of private ships, or commissioned officers of the navy. The records of this court will show numerous instances in which the judges now in commission have tried sea offences of every denomination, and have sentenced to capital punish-

---

[1] See opinion of the learned judge [Case No. 15,690].

ment many persons convicted of homicides and other atrocious crimes committed on the high sea; and the question as a law fact now raised is whether the like powers extend to, and are to be exercised over, offences committed on board the armed vessels of the United States.

The answer to this inquiry must depend upon the true import and operation of the crimes act of April 30, 1790 [1 Stat. 112], and of March 3, 1825, in connection with the act of April 24, 1800 [2 Stat. 54], if the latter be a valid act, and still in force. This court can exercise no jurisdiction in criminal matters not allotted to it specifically by act of congress. This principle is definitely settled by the adjudications of the supreme court ([U. S. v. Hudson] 7 Cranch [11 U. S.] 32; [U. S. v. Coolidge] 1 Wheat. [14 U. S.] 415; [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 76); and U. S. v. Bevans, 3 Wheat. [16 U. S.] 336, determines that point most unequivocally, whatever may be its effect and influence on other questions connected with this case, upon which it has been so frequently cited. The objections to the jurisdiction of the court over the subjects of your inquiry result in these propositions: (1) That congress has power under the constitution to provide for the punishment of offences committed in the army and navy, without trial in the courts of law. (2) That the statute establishing rules for the government and regulation of the navy (April 23, 1800 [2 Stat. 45]) is an execution of that power in respect to the naval forces. (3) That the crimes acts of 1790 and 1825, neither in terms nor by necessary intendment, embrace offences committed in the navy; and only such offences committed in the army are punishable under them as are expressly reserved in the rules and articles of war for trial in the civil courts.

In support of the jurisdiction of this court over the matters charged before you, these general positions are contended for: (1) That the judicial power of this court under the constitution extends to all crimes against the United States committed on the high seas, and that such offences affecting the public peace or welfare must be proceeded against by indictment and trial before a jury. (2) That the crimes acts give to this court cognizance of murder and manslaughter committed on the high seas, without distinction between public and private vessels, and are a full execution of the constitutional power in that behalf. (3) That the power in congress to erect courts martial and punish offences by their sentence is an implied, and not a direct, power, and must be exercised in subordination to the positive powers reserved to the judiciary. (4) That the act establishing rules and regulations for the government of the navy, under the constitutional restriction, can give no authority to courts martial to try offences other than of a strictly military or disciplinary character, or such offences as are both committed and brought to trial out of the local jurisdiction of the circuit courts, or during the existence of war or public danger.

I do not attempt to lay down these positions in the precise language of counsel, but this statement exhibits the main conclusions which the arguments on the one side and the other labored to establish or combat, at least so far as they enter into the opinion I am about to submit to you.

The counsel have discussed the constitutional question as to the extent and character of the powers of congress in the government and regulation of the navy with the highest ability and learning, and if the duty devolved upon this court to settle that question definitively, I should feel constrained to bestow on it a much more labored and thorough examination, and give to the preparation of the opinion supporting my views a fuller development and wider range of illustration. But it does not appear to me that the case has assumed a posture rendering it necessary or fitting for this court to enter at large into the consideration of the constitutional point. The circuit court has but a limited authority, and, though its decision affords the rule of action in the particular case, and may control the district court within its own district, yet beyond that it has no force or efficiency in fixing the construction of the constitution or a law, and the court will accordingly cautiously forbear carrying its adjudication beyond the demands of the special point under judgment. The point to which that discussion is alone pertinent here is whether, if the act of April 23, 1800 [2 Stat. 45], confers on naval courts martial jurisdiction over murder and manslaughter committed in the navy on the high seas, congress had competent authority to pass such a law.

Under our system of jurisprudence the written constitution is the supreme law, and not only bestows on congress all legislative powers that can be rightfully employed, but, furthermore, limits with paramount authority the extent within which such legislation may be exercised. An enactment by congress, therefore, in violation of the constitution, or not authorized by its provisions, becomes inoperative and void, and no court, of the humblest powers, can be called upon to enforce it. Vanhorn v. Dorrance [Case No. 16,857]. No court would be bound by an ex-post-facto law, by an act of attainder, a statute directing magistrates to try capital cases without the aid of juries, &c. But it is a principle equally sound and clear that the collision between the constitution and statute, or the defect of power in congress to pass the law, must be of the most plain and indisputable character to justify in any tribunal a refusal to recognize its validity. The supreme court restrains its high powers within such limits, and the caution is more needful, and should be more imperative, with every subordinate magistrate and court. The presumption is always to be in favor of the validity of statutes, until the contrary is clearly demonstrated. [Cooper v. Telfair] 4 Dall. [4 U. S.] 14. Full effect will be given by every judicatory to a statute, unless its opposition to the constitution is of that nature that the court feels a clear and strong conviction of their incompatibility. [Fletcher v. Peck] 6 Cranch [10 U. S.] 87; [Fullerton v. Bank of U. S.] 1 Pet. [26 U. S.] 604; Serg. Const. Law, c. 34. Under these principles of decision, it is manifest that, unless the discrepancy between the constitution and the act in question is palpable and irreconcilable, this court must acquiesce in the authority of congress to pass it, and receive the act as the law of the land. In connection with this point, the constitution will be adverted to only for the purpose of ascertaining whether there is colorable or probable authority given to congress in this behalf, and accordingly all doubts, if any arise, will apply in support of the validity of the law, and not against it.

The provisions of the constitution which have been cited and commented on as applicable to this question are article 1, § 8, subds. 9, 11–15, and article 3, § 1, subds. 1, 2, and amendments 5 and 6.

To discern more distinctly the bearings of these several clauses on the subject under consideration, those parts deemed essential will be recited in connection. Congress shall have power to constitute tribunals inferior to the supreme court; to define and punish felonies committed on the high seas and offences against the law of nations; to raise and support armies; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces; to provide for calling forth the militia, &c.; and for governing such part of them as may be employed in the service of the United States. The judicial power of the United States shall be vested in one supreme court, and in such inferior courts as the congress may from time to time ordain and estab-

lish; the judicial power shall extend to all cases in law and equity under this constitution and the laws of the United States, and to all cases of admiralty and maritime jurisdiction. The trial of all crimes shall be by jury, and no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land and naval forces, or in the militia when in actual service in time of war or public danger. In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district wherein the crime shall have been committed.

It may conduce to a clearer apprehension of the nature and extent of the powers thus imparted by the constitution, and of the manner in which they were practically to be applied, to advert to the condition of the country in relation to these particulars antecedent to the adoption of the constitution. During the colonial dependency of this country, the power to raise and support armies and provide and maintain navies was solely with Great Britain, and the British forces on land or at sea were subject to her laws alone. The civil polity of the colonies was, however, ample, and, in many instances, sovereign, within their respective boundaries, but it is believed was never recognized as extending beyond their territorial limits. Accordingly, although all crimes and misdemeanors committed on land were punished in the local courts, offences on the high seas or on waters within the admiralty jurisdiction were placed under the cognizance of the vice-admiralty courts, and were punishable under the laws and authority of the mother country. This jurisdiction was conferred by commissions issued from the high court of admiralty, and was exercised in capital cases by the vice-admiralty judge or commissary, in conjunction with the local judges of the superior court, governor, or lieutenant governor, and, it is believed, always up to the Revolution, without the intervention of juries.

A commission issued to Lewis Morris, in 1738, appointing him commissary of the provinces of New-York, Connecticut, east and west New-Jersey, empowered him personally, or by surrogate or deputy, to try all crimes and offences committed on the high seas, &c., according to the civil and maritime laws and customs of the high court of admiralty of England anciently used. Other commissions of the same tenor issued to the vice-admiralty here, and were undoubtedly granted in all the provinces. De Lovio v. Boit [Case No. 3,776]; Serj. Const. Law, Introduction, 4, 5. The archives of the court exhibit a trial for piracy before such court, without a jury, as early as the year 1701, and the valuable treatise of Mr. Washburne shows that trials in that form were common in this district, while composed of the New-England states, New-York, and New-Jersey, and in the Northern district, after it was separated in 1703 from New-York, from the year 1673 to the Revolution. Jud. Hist. Mass. 172, 176.

Time will not permit my examining with fulness and accuracy into the constitution of the admiralty courts of the several states, or the manner in which offences at sea were tried during the Revolutionary War. Some of the courts were probably first erected under the resolution of congress of 1775 (Sergt. Const. Law, 10, 11; 1 Jour. Cont. Cong. 142; 1 Laws [Bior. & D.] 620); and others, the organization of which had been retained by individual states as they existed at the Declaration of Independence, may have still continued their accustomed jurisdiction under the authority of the state. [Ross v. Rittenhouse] 2 Dall. [2 U. S.] 162; 3 Hall, Law J. 211, 221; Dup. Jur. 136; De Lovio v. Boit [supra]; Washburne, 185. But whatever may have been the character of the jurisdiction employed by these local admiralty courts from 1774 to 1781

in the trial and punishment of crimes committed at sea, it is most manifest that none was ever exercised in them over offences occurring in the naval forces. These forces were under the exclusive government and control of the continental congress, and in no way made amenable to the jurisdiction of the state courts. On the contrary, the earliest exercises of national authority by the congress, and not the least emphatic ones during the period of its existence, in the form of positive legislation, were the enactment of rules and articles of war for the government of the army, and rules and regulations for the government of the navy, by which the entire authority over both these branches of the public service was assumed by congress, and enforced by courts martial, without reference to the local tribunals. 2 American Archives, 1855; 1 Jour. Cont. Cong. 128, 139, 262. This separation of the land and naval forces from connection with the local courts, and method of punishment of offences committed within either by the appropriate courts martial, was resumed and maintained under the confederation, while that government continued, and until it passed into the national constitution. By the 9th article of the confederation, congress was empowered, with the assent of nine states, to enter into war. They had plenary power to appoint courts for the trial of piracies and felonies on the high seas, and to make rules for the government and regulation of the land and naval forces, and to direct their operations; and, on authorizing the raising of land forces in 1787, they recognized the existing rules and articles of war as in force for the government of the troops (12 Jour. Cont. Cong. 173); and this understanding of the continued operation and force of the rules and articles of war is shown by various statutes passed since the adoption of the constitution (Sept. 29, 1789, § 4 [1 Stat. 96]; April 30, 1790, § 13 [1 Stat. 121]; April 10, 1806, § 3 [2 Stat. 359]).

Congress executed the power to appoint courts for the trial of piracies and felonies on the high seas immediately after its organization under the confederation. By resolve of April 5, 1781, they directed that such offences should be inquired of, indicted, and tried by grand and petit juries according to the course of this common law, and constituted the justices of the supreme or superior courts of judicature and judges of the courts of admiralty of the several and respective states, or any two or more of them, judges for hearing and trying such offenders. 7 Jour. Cont. Cong. 76; 1 Laws [Bior. & D.] 670, 671. The members of the convention who framed the constitution, the citizens of the respective states, who finally adopted it, had been familiar through the Revolution, and the period of the confederation, with this arrangement and practical exercise of those respective powers.

When then they transferred to the new constitution the language of the confederation in relation to the government of the land and naval forces, and the spirit of the provision in respect to piracies and felonies, it is natural to suppose that these provisions were understood in the same sense, and were designed to convey the same power, as that affixed to them in the usages and practices under the preceding government. These circumstances would justly have great significancy in denoting that the constitution on its adoption was understood and designed to leave to congress the power to govern the land and naval forces as heretofore, by means of courts martial, and that piracies and felonies in their ordinary common-law acceptation should be referred to the judiciary, and be indicted and tried by juries.

It is also a circumstance of some weight, in ascertaining the understanding and intent of the convention in the provisions of the constitution under consideration, that the usages of the continental government were designed to

be in strict correspondence with those of England in the same particulars. The rules and articles of war were borrowed in substance from the English mutiny acts, and those of the navy were copied literally, in all important features, from Act 22 Geo. II. c. 25 (1 MacArthur, Ct. Mart. 348, Append. No. 1; Jac. Law Dict. "Navy," 3), and the trial of sea felonies was made to conform to the proceedings in like cases before the oyer and terminer of the admiralty sessions. I think the English law, as understood at that day, was definite and clear that courts martial, army or navy, had exclusive cognizance over all offences against the rules and articles, unless jurisdiction was expressly given by statute to some other tribunal. Such acceptation of the import and operation of the articles connected with the familiar usages under the continental government tends strongly to show that, in giving congress power to make rules for the government and regulation of the land and naval forces, that power was intended to be broad enough to cover what was to that time practiced in England, and in this country, in that behalf. The implication of such full power from the terms used in the first article (section 8, cl. 13) would probably be of equal force with an express grant,—Gibbons v. Ogden, 9 Wheat. [22 U. S.] 209,—without the intervention of the third article, which attaches to the judiciary department the prosecution and trial of all crimes. It is to be remarked the expression "all crimes," in the article, is not to be taken in an absolute sense, as embracing every description of criminal offences; for the fifth amendment excepts from prosecution before a jury some cases arising in the land and naval forces and the militia. Whether all of that class of cases are excepted, it is not necessary to inquire, in this connection. There must, upon the plain meaning of the exception, be left to congress a power to legislate to some extent over the punishment of offences committed in the army or navy, by other means than trial by jury.

The next consideration is, whether this reserved power by the terms of the exception is limited to cases arising when the forces are in actual service in time of war or public danger; or whether there is an implied limitation of it to cases of a strictly disciplinary or military character, or to cases tried out of the territorial jurisdiction of the United States. As to the first of these positions, it appears to me that the arrangement of the excepting clause to the fifth amendment, obviously imports that the qualification of actual service and a state of war or public danger applies to the militia alone. By the provisions of the first section the militia are liable to be called into the service of the United States, and placed under their government, only under the existence of the exigencies of public danger in war. The terms of the limitation would therefore apply to this peculiar service exacted from the militia, but would be unusual and extraordinary in respect to forces under the regular enlistment, and whose subjection to the authority of the general government had no necessary connection with a condition of war or public danger. I have therefore no hesitation in deciding that the power of congress over the land and naval forces is irrespective of the actual condition of the country, and is the same in time of peace as in time of war or public danger.

The farther limitation argued for, to military offences strictly, or such as are committed abroad, does not arise out of the language of the power, but is inferred because of a supposed conflict with the authority of the judiciary, if the power be understood in an unlimited sense. Whatever may be the force of this argument, it does not establish an inevitable collision between the two clauses of the constitution, but only a possible one, dependent chiefly upon the construction of the fifth amendment, whether the exception embraces the entire subject of cases arising in the army and navy, or only special and peculiar instances. To show a mere equivocal or dubious power in congress is not enough to nullify a law; the want of authority to pass it must be palpable.

It has been urged that there is an inherent restriction in the power to make rules for the government and regulation of the land and naval forces, confining the authority over these arms of public service to them in their organized and collective capacity. That to govern and regulate these forces, obviously imports an authority to control their operations and act upon them in their aggregate character, and that the power over the individuals composing the forces is only incidental, and can be carried no farther than is indispensable to maintain such organization and conduct such operations. It may be worthy of remark, that this power as expressed in the articles of confederation, was that of "making rules for the government and regulation of the land and naval forces, and directing their operations," implying, probably, that a doubt might exist whether the authority to govern and regulate the forces might not be construed as confined to the individuals composing them, and that therefore it was needful to obviate this possible qualification of the power, by a direct one over the forces in their united and combined character, and to that end the clause empowering congress to direct their operations was added. The convention, in copying from the articles of confederation the body of the power, omitted the closing clause. It was obviously superfluous, because the disposition and operation of the forces must be one incident to and inseparable from their government. The alteration, however, is significant to show that the states when the articles of confederation were established, and the convention in framing the constitution, understood the power to govern and regulate forces as indubitably comprehending legislative authority over the individuals constituting the forces. This is palpably the natural force of language; a different reading would be an artificial and constrained construction. A power to make rules for the government and regulation of a nation, a province, a city, necessarily imports full authority over the individual subjects as well as the community collectively. Neither in the ordinary acceptation, is the idea of land or naval forces limited to bodies combined and acting only in an organized form; each component part is as distinctly signified as if separately named. The grand total of the national powers is expressed in the term forces. But so also are its constituents to whatever diminution of sub-divisions. Armies, divisions, brigades, regiments, companies, guards, sentinels; fleets, squadrons, separate vessels, boats, crews, are land and naval forces, integrally and independently, no less than when compounded in the general mass, and so is the individual soldier and seaman. These observations, gentlemen, are all I propose to offer you on this branch of the subject.

It is not my purpose to attempt to settle the true construction of the constitution in the particular under consideration. The provisions of the constitution have been reviewed to ascertain whether they plainly interdict to congress the power to pass laws to punish by courts martial, common law crimes committed in the army or navy; and if no such prohibition exists, whether there is in those provisions probable cause to imply the existence of such power in congress.

I have already stated to you that, upon general principles, and in consonance with the adjudications of our highest tribunal, it is the duty of this court to accept an act of congress as of full authority and binding, if there be only color of authority or probable cause in the constitution to uphold it. I limit myself therefore to the remark that the incongruity insisted on between the constitution and an act

of congress assuming to take from the judiciary and confer on courts martial jurisdiction over criminal offences in the navy, is not direct and palpable, and is no more than supposititious and inferential, and accordingly reaches no farther than to raise a doubt whether the power is vested in congress. If such doubt exists, it is not to apply against the validity of the law, but in support of it. I therefore decide that in respect to this court and the action of your body, the act of congress of April 23, 1800, is valid and obligatory, even if in its true construction it gives exclusive jurisdiction to a court martial over the homicides complained of before you.

Under this view of the subject, gentlemen, there can be no doubt of the power of congress to govern the army and navy, by bringing offences committed in either under the cognizance of the courts of law. Heuston v. Moore, 5 Wheat. [18 U. S.] 1. This power is fully executed in respect to the army in the rules and articles of war adopted April 10, 1806. Rule 33, 4 Laws [Bior. & D.] 18 [2 Stat. 364]. But no such expression of intention is introduced into the navy code. Whether then the courts of the United States are to take cognizance of offences committed in the naval forces depends entirely upon the true intent of congress in that behalf as expressed in the crimes acts of 1790, 1825 and 1835, and the navy act of 1800. The competency of this court under the constitution and the judiciary act—section 11 [1 Stat. 78]—to exercise the jurisdiction cannot admit of question.

The sole inquiry then is, has the jurisdiction been given it over the subject matter, by act of congress, in express terms, or by necessary implication? The argument on this branch of the case has on both sides been exceedingly thorough and acute; and although my duty and pleasure to study the reasonings and authorities adduced, with minute care and attention, it will not be necessary, nor will it be physically in my power, within the limits of these instructions, to state to you the details of this examination or its results in respect to all the particulars of the argument. The necessity of the case compels me to attempt no more than to lay before you the general conclusions of my judgment upon the controlling points embraced in your inquiries. The first crimes act was passed April 30, 1790 [1 Stat. 112], at the second session of the first congress. No action had been taken on the subject at the previous session, other than to provide for the apprehension and trial of criminals. Act Sept. 24, 1789, §§ 11, 33 [1 Stat. 78].

In proceeding to institute and establish a system of criminal jurisprudence, congress acted upon the assumption that there were four great classes of national offences over which it had supreme authority: (1) Infractions of the law of nations; (2) violations of the laws of the Union within the territorial limits of the United States; (3) piracies and felonies on the high seas or criminal offences committed there; and (4) offences committed in the army and navy and militia, when in actual service of the United States.

It was unquestionably competent for congress to legislate over all those subjects in a single statute or section, and when language is employed specifically applying to some of the subjects, and broad enough to embrace others, but not designating them expressly, it becomes a question of construction resting upon the intent of the legislature, whether the law is to have the more extensive or the more limited application. For instance, this statute punishes, but not capitally, misprision of felony, manslaughter, mayhem, embezzlement of public property or receiving stolen goods, committed in any port or place under the sole and exclusive jurisdiction of the United States; and this language is plainly extensive enough to include the commission of those crimes by

the land forces of the United States stationed at such places. Was it the intention of congress to apply this general legislation over crimes on land to like offences committed in the army? By the fiftieth article of the rules and articles of war, all crimes not capital, though not mentioned in the articles of war, are to be taken congnizance of by court martial and to be punished at their discretion. The second additional article provides for the punishment of embezzlement, by courts martial, etc. Those rules and articles of war were re-enacted by a general adopting clause in Act Sept. 29, 1789, § 4 [1 Stat. 96], and were accordingly in force when the crimes act was passed.

If, then, the general intendment might be that the posterior law repealed or superceded the antecedent one, that presumption or rule of construction could not be applied to the act of 1790, because on the same day that statute was enacted, congress passed another regulating the military establishment, by the thirteenth section of which it was declared that the commissioned officers, non-commissioned officers, privates, etc., of the army shall be governed by the rules and articles of war which have been established by the United States in congress assembled, as far as the same may be applicable to the constitution of the United States, etc. 2 Laws [Bior. & D.] 102 [1 Stat. 121].

Here then is a most positive and authoritative exposition of the crimes act, showing that it had no paramount operation over the land forces, but must be construed in subordination to the rules and articles of war applicable to the case. The thirty-second article of the existing rules of war—4 Laws [Bior. & D.] 18 [2 Stat. 359]—is pertinent to show the understanding of congress that express legislation was necessary in order to bring officers and privates of the army to trial before the civil courts for capital crimes, or acts of violence to the persons or property of citizens, and affords additional evidence that the crimes act of 1790 was not intended to apply to the land forces. At that time the United States had no ships of war in commission, and though the language of the act of 1790 is broad enough to include offences committed in the naval forces, yet the punishment provided for offences on the high seas would not as a fact have that direct and certain application to the navy that the statute had to crimes on board merchant vessels. There is, however, nothing incongruous or unusual in legislating prospectively in contemplation of a state of things likely or probable to exist. Nothing could be more probable with a maritime people having the habitudes of ours and connected with all the trading nations of the earth by an active and increasing commerce, than that ships of war and navies would speedily be constructed and put in service, and language in an act of congress adapted to vessels of that character, though not in fact in existence, would most properly be held as contemplating their existence and be applied to them when they should be called into service, if the construction and application of the language were to be gathered from the act alone.

I shall not go into a critical scrutiny of the phraseology of the crimes acts of 1790 and 1825, to test the force of the internal evidence, or how it preponderates, indicating an intent of the legislature to limit those acts to merchant vessels or to embrace within them national vessels also—supposing the language used in its general import to be alike applicable to either. I consider the act of April 23, 1800 [2 Stat. 45], a more satisfactory key to the intent of the act of 1790, or if not legitimately operating as an exposition of the crimes act, yet as fixing with clearness and certainty the rule thereafter to be applied to public vessels. It harmonizes with the legislation in respect to the land forces, placing each under its own laws and

courts to such extent as the discretion of congress deemed proper. Offenders in the land forces in certain cases were to be delivered over to the courts of law for trial and punishment. A similar provision is contained in the English mutiny act (2 MacArthur, 229), without which it would seem to be thought that under the general authority to try all cases not capital, courts martial would have exclusive cognizance of that class of offences when committed in the army (1 Toml. Law Dict. 482; 2 MacArthur, 296). But no such direction or authority is incorporated in the naval code, and the design of congress therefore to give the entire jurisdiction over the offences enumerated to the naval courts martial would seem indubitable. In this connection the reasoning of the supreme court, in U. S. v. Bevens, has direct pertinency and force (3 Wheat. [16 U. S.] 336). That case was argued with great talent and fulness, and the opinion delivered by the court manifests that it was considered with deep attention.

The question before the court was solely as to the operation and meaning of the crimes act of 1790. The indictment was on the eighth section of that act, here also in question. The act was cautiously explored by the court to ascertain whether there was any provision within it authorizing a circuit court to try one indicted for murder on board a ship of war, within the territorial jurisdiction of the United States; and a leading inquiry was whether language in the crimes act which might embrace a ship of war should be applied to it. First, the court repudiates the signification claimed for the word "place" under the exclusive jurisdiction of the United States used in the act, as comprehending a ship of war. But then not satisfied with that conclusion upon the mere import of a word and phrase, draws from the act what must be regarded an adjudged conclusion by the court as to its language and meaning, that there was no provision in that act adapted to the punishment of crimes in the navy. The court assigns a reason in fact why it was omitted or postponed, and then adverts to the act of April 23, 1800 [2 Stat. 45], as fortifying the conclusion, because that statute specifically relating to offences in the navy, gives no jurisdiction to courts of law of any crime committed in a ship of war, wherever it may be stationed. Although this is not an authoritative adjudication upon the specific point now raised, yet as to the intention of congress as expressed in the act of 1790, and the design and effect of the act of 1800, it affords high and commanding evidence that congress has power to legislate specifically for the government and regulation of the navy and to place that government in courts martial to the exclusion of courts of law. Almost forty years have elapsed since this law was passed. In that period the navy has augmented in numbers and force, and has been in service in all quarters of the globe. No instance is produced in which, during that period and under circumstances so probable to give occasion for it, the jurisdiction of the courts of law has been applied to the trial of offences in the navy cognizable by naval courts martial. This fact is of commanding cogency to establish the common conviction of the executive, legislative, and judicial departments of government, that no such jurisdiction exists. The supreme court regard it as a circumstance of deserved weight in support of the constitutionality and validity of an act of congress, that there has been a uniform course of action, or a partial acquiescence for a long period of time in consonance with the power exercised under the act. [Stuart v. Laird] 1 Cranch [5 U. S.] 299; 11 Pet. [36 U. S.] 257.

In respect to the institution of the circuit courts, most of the judges when applied to by General Washington, on the first adoption of the judiciary act, gave their opinions that the act in that particular was not authorized by the constitution. 1 Story, Const. Law, 437,

479, note. Yet the supreme court, after the law had been in a course of execution and acquiesced in for less than 15 years, decided that it was too late to call its constitutionality in question. [Stuart v. Laird] 1 Cranch [5 U. S.] 299. Cases to this point may be largely multiplied, but I deem the labor unnecessary, and should regard it an exceedingly unadvised and hasty act in this court, after so long and notorious an execution of the act of 1800, to assume the authority to pronounce it unconstitutional and void as to any of its provisions.

The jurisdiction of courts martial over the subject matter within their cognizance, I regard to be absolute and exclusive. From the examination I have bestowed on this point, I am persuaded this is the result of the English authorities, but I do not introduce them here or comment on them, because if in that country the courts of general jurisdiction would retain their powers, unless expressly taken from them by act of parliament, and might thus have cognizance of cases also assigned to courts martial, as inferior courts, that principle does not apply to the organization of our judicatories. The circuit court is a special court and of statutory jurisdiction, in precisely the same sense as a court martial. The circuit courts have no residuary or general jurisdiction, and none whatever over subaltern courts, except it be bestowed by positive law. The case of Houston v. Moore, 5 Wheat. [18 U. S.], is clear to the point, that the jurisdiction of courts martial is exclusive and final as to matters submitted to such courts by act of congress. Serg. Const. Law, 130; Rawle, Const. 209; Opinion of Judge Kent, Case of Somers.

Gentlemen, I shall be able to condense within a few remarks, what I propose saying to you in respect to the operation and effect of the crimes acts of 1825 and 1835 on these questions. The naval code had been in force a quarter of a century as a distinct and independent system of jurisprudence over the offences assigned to its jurisdiction, when the act of 1825 was passed. The decision in the case of U. S. v. Bevans [supra] made in 1818, had indicated to the public what was the judicial acceptation of that code, and also as to the effect of the crimes act of 1790, in relation to offences in the navy. The presumption therefore would be of the most violent character, that if congress designed by either of the later statutes to interfere with this known and settled course of the law in this respect; that intent would be directly and plainly expressed; and that a mere re-enactment of any provisions of the statute of 1790 would not be designed to have an operation broader than they were known to have under the former act. It is to be farther observed that though the act of 1825 (section 4) denounces the crime of murder in the same language as is used in section 8 of the act of 1790, yet other offences are introduced into the former section not found in that of 1790—and the one is accordingly not a precise re-enactment of the other, nor to be regarded as supplanting the former law, or establishing a substantively new one. But what is still more pointed and direct, and becomes in my judgment conclusive on this point, is that in the only section of the act of 1825 (section 11) in which offences on board vessels of war, or in relation to vessels of war, are specifically mentioned, the authority of naval courts martial is expressly reserved.

In my opinion the effect of this evidence is not varied, if that proviso is understood as limited to that section only, for the body of the section demonstrates that if congress means its penal law shall apply to ships of war, those vessels will be specifically named, and imports furthermore that without being so named, they will not come within the range of legislation in respect to crimes, and the proviso affords direct and positive evidence that congress recognized the power of naval courts martial as an

existing jurisprudence over crimes of a general bearing and character, and affecting the public otherwise than merely in the preservation of discipline. To the same effect is the first section of the act of 1835, which provides for the punishment of mutiny or revolt, a crime denounced in the act of 1790, and in the naval code of 1800, for it repeals the punishment of death for the offence imposed by the act of 1790, commuting it to fine and imprisonment, and leaves the act of 1800, which inflicts the same punishment for the same offence, in full force.

Without pursuing the discussion farther, I state to you, gentlemen, that in my judgment, neither of the acts of 1825 or 1835 gives to this court jurisdiction over the crime of murder committed on board a ship of war, and triable before a naval court martial. Manslaughter is not named in the naval code as an offence punishable by court martial, and it is contended that there is therefore nothing to intercept the jurisdiction of this court, given by the crimes act over that offence.

It is a general principle governing prosecutions in courts martial as well as in criminal courts of law, that the court may convict the accused of a crime of less degree than that charged in the accusation, but not of a distinct crime. 12 Petersd. Abr. 591, note; 1 Toml. Law Dict. 483. This is the same rule that prevails at law (1 Chit. Cr. Law, 521), and accordingly on a charge of murder the accused may be acquitted of that and be convicted of manslaughter. Article 32 of the naval code provides that all crimes committed by persons belonging to the navy which are not specified in the foregoing articles, shall be punished according to the laws and customs in such cases at sea. 3 Laws Bior. & D. 246 [1 Stat. 709]. Manslaughter falls within the general denomination of a crime. 4 Bl. Comm. 5. The thirty-second article is taken from the article in the rules of 1775, and is also in substance the same with the English article 36 (1 MacArthur, 336), except that the expression in the latter is "used at sea." Numerous offences of various grades were from an early day known and recognized as crimes according to the customs of the sea, and were proceeded against and punished under a species of common law made applicable to them. They were originally punished in the admiralty court alone, and subsequently by inquest and petit juries before the admiralty sessions. The latter method of proceeding is particularly illustrated in an ancient inquisition in the year 1376 (Clerke, Praxis, Adm.), and in Sir Lionel Jenkins' charge to a grand jury at the admiralty session (about) 1668. 1 Sir L. Jenkins' Works, 90. See, also, Black Book of the Admiralty; Zouch. Adm. 1–34; God. Adm. Jur. 26; Sea Laws, 195. Manslaughter is mentioned in the first document, but not in the second, as one of those offences punishable under the customs of the sea. The English naval articles no doubt had relation to those ancient customs (Sutton v. Johnstone, 1 Durn. & E. [1 Term R.] 784, 520, per Lord Mansfield), but it is unnecessary now to decide whether our code is to be understood to confer jurisdiction over offences by that name. The

article refers to that custom only for the measure of punishment, and not for the authority to try; and as it expressly gives jurisdiction over all offences committed in the navy, a defect or failure of authority to designate a punishment, might not affect the question of jurisdiction as between one court and another. But I think the true ground to place this point upon is, that the accused are charged with manslaughter in taking the life of a seaman belonging to the ship, in doing what they claim to be the exercise of their rightful authority and command on board of a vessel of war, and that no statute of the United States gives this court jurisdiction to inquire into and punish that offence. This point is not so clear in my mind as the others, but from the best consideration I am able to bestow on the subject, I am led to the conclusion that naval courts martial have jurisdiction to punish the offence of manslaughter committed at sea on board of ships of war.

Gentlemen, questions affecting the jurisdiction and rightful powers of courts of law are always of a delicate and embarrassing nature. The law imperiously demands of every tribunal that it shall employ all its rightful functions in the furtherance of public justice, and it no less emphatically forbids to it the usurpation of authority not clearly bestowed upon it by acts of congress. In its supreme power over all the subjects of criminal jurisprudence, the legislature is to be supposed to allot jurisdiction to one tribunal or another, or withhold it from all, in the exercise of a wise and just discretion, and so as most efficiently to subserve the ends of public justice and the protection of the citizen.

It belongs to no court to arrogate to itself a wisdom beyond that of the legislature in this respect; and in conducting the inquiry into what the law has ordained and established in this behalf, and with the facts before us, that the naval code, as a distinct system of jurisprudence under our laws, has been in force for nearly forty years, that thirty of the last years of that period have witnessed a large increase of the naval forces, and a vast scope of employment, and that the application of the naval code by means of courts martial has been constant and notorious to every department of the government,—that a quarter of a century since the highest judicatory of the land intimated and published its opinion that the general crimes act did not apply to offences committed on board ships of war,—and that congress since that period has legislated at large over felonies and offences at sea, without directly bringing vessels of war within that legislation, except where the authority of courts martial was also reserved,—and that throughout the time the events on board the Somers have most agitated the public attention, and when the civil authorities of this district openly declined to exercise jurisdiction over the case, congress continued in session without changing the law or acting upon the matter, I think we must all feel a deep conviction that this court ought not to be the first to assume such a jurisdiction, and arraign the parties accused on a matter touching their lives.

# W.

WALKER (DIXON v.). See Case No. 18,291.

WASHINGTON, THE CITY OF. See Case No. 18,278.

WATERS (BIBBS v.). See Case No. 18,235.

WILMINGTON & R. R. CO. (HANCOCK v.). See Case No. 18,300.

WINDER (CALDWELL v.). See Case No. 18,245.

WYLIE (BALDWIN v.). See Case No. 18,228.